## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | |
| | ) | Civil Action Number |
| **ALABAMA DEPARTMENT OF** | ) | **2:08-cv-655-AKK** |
| **REVENUE and JULIE P.** | ) | |
| **MAGEE, Commissioner of the** | ) | |
| **Alabama Department of** | ) | |
| **Revenue,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

"Discrimination cases sometimes do raise knotty questions about whether and when dissimilar treatment is adequately justified." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S. Ct. 1101 (2011). Here, on remand from the Supreme Court of the United States, *see id.*, this court is called upon to answer such a knotty question and must determine whether, under the Railroad Revitalization and Regulatory Reform Act ("4-R Act"), 49 U.S.C. § 11501, the State of Alabama's "sales and use" tax constitutes "another tax that discriminates against a rail carrier." *See* doc. 1 ("Complaint"). The court finds no violation of the 4-R Act, and accordingly, will enter a separate order **DISMISSING** Plaintiff CSX Transportation, Inc.'s ("CSX") Complaint **with prejudice**.

## I.   PROCEDURAL HISTORY

CSX originally filed this action on April 14, 2008, "seeking to restrain and enjoin defendants . . . from assessing, levying, or collecting from plaintiff Alabama sales and use taxes on plaintiff's purchase or consumption of diesel fuel and gasoline used for rail transportation purposes in Alabama" because the "imposition of Alabama sales and use taxes on diesel fuel and gasoline purchased and used for rail transportation purposes is discriminatory and unlawful under Section 306 of the [4-R Act], Pub. L. No. 94-210, 90 Stat. 54 (February 5, 1976), now codified as 49 U.S.C. § 11501."  Doc. 1, at 3.  CSX's Complaint "also seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that defendants' imposition of sales and use taxes on the purchase and consumption of diesel fuel and gasoline for rail transportation purposes in Alabama violated" the 4-R Act.  *Id.* at 3-4.  On July 8, 2008, Judge U.W. Clemon granted CSX's motion for a preliminary injunction and ordered CSX to "pay the disputed tax funds into an Escrow Fund, to be established at a financial institution mutually agreed to by the parties, pending final resolution of this action."  Doc. 14.

However, on July 23, 2008, the court stayed this action pending the outcome of the Eleventh Circuit's decision in *Norfolk S. Ry. Co. v. Ala. Dep't of Revenue*, NO. 08-12712-FF.  *See* doc. 19.  On December 16, 2008, the court dismissed this action, thereby dissolving the preliminary injunction, because the Eleventh Circuit held in *Norfolk Southern* that a tax *exemption* cannot constitute "another tax that discriminates against a rail carrier."  Doc. 22 (citing *Norfolk S.*

*Ry. Co. v. Ala. Dep't of Revenue*, 550 F.3d 1306, 1314-15 (11th Cir. 2008)).  CSX

appealed on January 29, 2009, doc. 23, but the Eleventh Circuit affirmed this

court's dismissal under *Norfolk Southern* on September 3, 2009.  Doc. 28 (*CSX

Transp., Inc. v. Ala. Dep't of Revenue*, 350 F. App'x 318 (11th Cir. 2009)).  CSX

petitioned the Supreme Court of the United States for a writ of certiorari which the

Court granted on June 14, 2010 to decide the following question: "Whether a

State's exemptions of rail carrier competitors, but not rail carriers, from generally

applicable sales and use taxes on fuel subject the taxes to challenge under 49

U.S.C. § 11501(b)(4) as 'another tax that discriminates against a rail carrier.'"

*CSX Transp., Inc. v. Ala. Dep't of Revenue*, 130 S. Ct. 3409 (2010).

On February 22, 2011, Justice Kagan announced the opinion of the Court

reversing the Eleventh Circuit and holding that "CSX may challenge Alabama's

sales and use taxes as 'tax[es] that discriminat[e] against . . . rail carrier[s]' under §

11501(b)(4)."  *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S. Ct. 1101, 1114

(2011) (alterations in original).  The majority opinion, however, refused to address

whether "Alabama's taxes in fact discriminate against railroads by exempting

interstate motor and water carriers."  *Id.*  As such, the Court remanded the merits

question.  *Id.* at 1107 n.5, 1114.  The Eleventh Circuit, in turn, vacated its prior

opinion, 350 F. App'x 318, and vacated this court's "December 18, 2008 order

dissolving the preliminary injunction and dismissing CSXT's case," thereby

remanding the case for further proceedings consistent with the Supreme Court's

opinion.  *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 639 F.3d 1040 (11th Cir.

2011).

The undersigned received this remanded matter upon reassignment of the action on February 28, 2011, and, on March 10, 2011, restored the previously entered preliminary injunction, thereby enjoining Defendants from "assessing, levying, and/or collecting taxes on diesel fuel purchases and use by [CSX], pending a trial and determination on the merits of [CSX's] cause of action."  Doc. 35.  The court also required CSX to "pay the disputed tax funds into an Escrow Fund, to be established at a financial institution mutually agreed to by the parties, pending final resolution of this action."  *Id.*  On April 25, 2012, the court held a bench trial in this matter, *see* doc. 65, and also received pre- and post- trial briefs by both parties, *see* docs. 61, 62, 67, 68, 69, 70.

## II.   FACTUAL BACKGROUND

The parties stipulated to many of the underlying facts in this matter.[1]  CSX is a Virginia Corporation with its principal place of business located in Jacksonville, Florida.  CSX is engaged in interstate commerce as a common carrier by railroad.  The Alabama Department of Revenue ("Department") is the Department of the State of Alabama charged with the responsibility to administer and collect taxes within Alabama, including the administration of sales and use taxes.  Defendant Julie P. Magee is the Commissioner of Revenue of the State of Alabama ("Commissioner") and is named in this action in her official capacity

---

[1] At trial, the court admitted as a joint exhibit the stipulated facts in ¶¶ 1-19 of Document 63.  *See* doc. 65, at 13.

only.  As Commissioner, Ms. Magee exercises general supervision over administration of the assessment and taxation laws of Alabama, including those imposing sales and use taxes.

Alabama imposes a sales tax on the gross receipts from the business of selling at retail or renting tangible personal property, or of furnishing entertainment.  Alabama also imposes a use tax on the use or other consumption of property in the state.  Railroads are subject to the sales and use taxes on either their purchase or consumption of diesel fuel in the State of Alabama.  The tax is imposed by the State at the rate of 4%.  *See* Ala. Code §§ 40-23-2(1),[2] 40-23-61(a).[3]  Moreover, under Alabama law, counties and municipalities may impose

---

[2] "There is levied, in addition to all other taxes of every kind now imposed by law, and shall be collected as herein provided, a privilege or license tax against the person on account of the business activities and in the amount to be determined by the application of rates against gross sales, or gross receipts, as the case may be, as follows:

(1) Upon every person, firm, or corporation, (including the State of Alabama and its Alcoholic Beverage Control Board in the sale of alcoholic beverages of all kinds, the University of Alabama, Auburn University, and all other institutions of higher learning in the state, whether the institutions be denominational, state, county, or municipal institutions, any association or other agency or instrumentality of the institutions) engaged or continuing within this state, in the business of selling at retail any tangible personal property whatsoever, including merchandise and commodities of every kind and character, (not including, however, bonds or other evidences of debts or stocks, nor sales of material and supplies to any person for use in fulfilling a contract for the painting, repair, or reconditioning of vessels, barges, ships, other watercraft, and commercial fishing vessels of over five tons load displacement as registered with the U.S. Coast Guard and licensed by the State of Alabama Department of Conservation and Natural Resources), an amount equal to four percent of the gross proceeds of sales of the business except where a different amount is expressly provided herein . . . ." Ala. Code § 40-23-2.

[3] "An excise tax is hereby imposed on the storage, use or other consumption in this state of tangible personal property, not including, however, materials and supplies bought for use in fulfilling a contract for the painting, repairing or reconditioning of vessels, barges, ships, other

sales and use taxes which correspond to and parallel the state's sales and use tax. The rates imposed by the counties and municipalities are in addition to the 4% rate imposed by the State of Alabama. The counties and municipalities are required by state statute to conform their rules, regulations, and procedures for the administration of sales and use taxes to the rules, regulations, and procedures adopted by the Department of Revenue. *See* Ala. Code §§ 11-3-11.2, 11-51-200 through 204; Ala. Code § 40-12-4. The following are the current sales and use tax rates imposed by cities and counties on CSX's purchase and use of diesel fuel: City of Birmingham - 4%, City of Mobile - 4%, City of Montgomery - 3.5%, County of Jefferson - 2%, County of Mobile - 1%, County of Shelby - 1%, County of Montgomery - 2.5%, County of Jackson - 2%, City of Bridgeport - 3%.

The Commissioner, acting through the Department, collects and administers sales and use taxes. The sales tax is collected by retailers, including operators of places of amusement, but is actually imposed on the consumer. *See* Ala. Code § 40-23-26(c). CSX, however, holds a direct pay permit issued by the Department. Under a direct pay permit, vendors of CSX do not collect the sales tax from CSX and then remit the taxes to the Department or local counties and municipalities; instead, CSX files sales and use tax returns and pays the taxes directly to the

---

watercraft and commercial fishing vessels of over five tons load displacement as registered with the U.S. Coast Guard and licensed by the State of Alabama Department of Conservation and Natural Resources, purchased at retail on or after October 1, 1965, for storage, use or other consumption in this state at the rate of four percent of the sales price of such property or the amount of tax collected by the seller, whichever is greater . . . ." Ala. Code § 40-23-61(a).

Department and to the local counties and municipalities.

The principal competitors to rail carriers in the transportation of property in interstate commerce in the State of Alabama are on-highway motor carriers of property ("motor carriers") and carriers of property by ship, barge, and other vessel ("water carriers").  Air carriers are also engaged in the transportation of property in interstate commerce, but this mode of transportation only marginally competes due to the relatively small size and weight of the property transported in Alabama.  Water carriers are exempt from sales and use taxes on their purchase or consumption of diesel fuel used for interstate or foreign commerce.  *See* Ala. Code §§ 40-23-4(a)(10) (sales tax),[4] 40-23-62(12) (use tax).[5]  Additionally, motor

---

[4] "There are exempted from the provisions of this division and from the computation of the amount of the tax levied, assessed, or payable under this division the following: . . . (10) The gross proceeds from the sale or sales of fuel and supplies for use or consumption aboard ships, vessels, towing vessels, or barges, or drilling ships, rigs or barges, or seismic or geophysical vessels, or other watercraft (herein for purposes of this exemption being referred to as 'vessels') engaged in foreign or international commerce or in interstate commerce; provided, that nothing in this division shall be construed to exempt or exclude from the measure of the tax herein levied the gross proceeds of sale or sales of material and supplies to any person for use in fulfilling a contract for the painting, repair, or reconditioning of vessels, barges, ships, other watercraft, and commercial fishing vessels of over five tons load displacement as registered with the U.S. Coast Guard and licensed by the State of Alabama Department of Conservation and Natural Resources."  Ala. Code § 40-23-4(a)(10).

[5] "The storage, use or other consumption in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this article: . . . "(12) Fuel and supplies for use or consumption aboard ships, vessels, towing vessels, or barges, or drilling ships, rigs or barges, or seismic or geophysical vessels, or other watercraft (herein for purposes of this exemption being referred to as vessels) engaged in foreign or international commerce or in interstate commerce; provided, that nothing in this article shall be construed to exempt or exclude from the measure of the tax herein levied the gross proceeds of sale or sales of material and supplies to any person for use in fulfilling a contract for the painting, repair or reconditioning of vessels, barges, ships, other watercraft and commercial fishing vessels of over five tons load

carriers are not subject to sales and use taxes on their purchase or consumption of petroleum products used for on-road transportation purposes; rather, interstate motor companies pay a Motor Fuels Excise Tax totaling 19¢ per gallon for on-road diesel fuel.  *See* Ala. Code §§ 40-17-2(1),[6] 40-17-220(e).[7]  According to the Freight Analysis Framework, an analysis of freight movement published by the United States Department of Transportation, in the year 2002, 82% of freight

_____

displacement as registered with the U.S. Coast Guard and licensed by the State of Alabama Department of Conservation and Natural Resources . . . ."  Ala. Code § 40-23-62(12).

[6] "There is hereby levied an excise tax on motor fuel of $.13 per gallon, which shall be collected as herein provided.

(1) Every distributor or supplier shall collect and pay over to the state Department of Revenue an excise tax of $.13 per gallon upon the receipt, by any means other than a transfer by a marine vessel or pipeline, of motor fuel from a terminal, refinery, barge, barge line, or pipeline terminal in this state, or upon import into this state by any means other than pipeline, marine vessel, or the fuel supply tank of the vehicle, for any use of motor fuel not exempted by this article. Provided, that where any excise tax imposed by this section shall have been paid to the state by a distributor or supplier the payment shall be sufficient, the intent being that the tax shall be paid to the state but once; provided, further, that motor fuel subject to the excise tax levied by this article shall not be subject to any other excise tax levied by the state. Motor fuel that is indelibly dyed and chemically marked in accordance with regulations issued by the Secretary of the Treasury of the United States under 26 U.S.C. § 4082 shall be exempt from the tax imposed by this section."  Ala. Code § 40-17-2, *repealed by* Act 2011-565, p. 1084, § 45, effective October 1, 2012.

[7] "Every distributor or supplier shall collect and pay over to the state Department of Revenue an excise tax of $.06 per gallon upon the receipt, by any means other than a transfer by a marine vessel or pipeline, of motor fuel from a terminal, refinery, barge, barge line, or pipeline terminal in this state, or upon import into this state by any means other than pipeline, marine vessel, or the fuel supply tank of the vehicle, for any use of motor fuel not exempted by this article. Provided, that where any excise tax imposed by this section shall have been paid to the state by a distributor or supplier the payment shall be sufficient, the intent being that the tax shall be paid to the state but once. Motor fuel that is indelibly dyed and chemically marked in accordance with regulations issued by the Secretary of the Treasury of the United States under 26 U.S.C. § 4082 shall be exempt from the tax imposed by this subsection."  Ala. Code § 40-17-220(e).

moved intrastate within Alabama was transported by trucks, 6% by rail, and 1% by water.

As it relates to the disbursement of the 19¢ per gallon Motor Fuels Excise Tax, *see* Ala. Code §§ 40-17-2(1), 40-17-220(e), the proceeds of 13¢ per gallon are distributed to the Alabama Department of Transportation for the construction, repair, maintenance, and operation of public roads and bridges, and payment of principal and interest on highway bonds. Ala. Code § 40-17-13.  The proceeds from the 6¢ per gallon tax are distributed as follows: (a) 4.69% to counties for construction and maintenance of roads and bridges, (b) 0.93% to towns and cities for construction and maintenance of roads and bridges, and (c) the remainder to the Alabama Department of Transportation for highway use.  Ala. Code § 40-17-222.

Finally, the parties provide in the stipulated facts that CSX is a "common carrier by railroad" within the meaning of Section 306(1)(d) of the 4-R Act.  49 U.S.C. § 11501.  Moreover, for the tax years 2006 through 2010, CSX paid the following amounts of property taxes to cities and counties in Alabama on its track structure: 2006 - $423,860.00; 2007 - $436,840.00; 2008 - $442,307.00; 2009 - $430,578.00; 2010 - $454.079.00.

The court held a bench trial on April 25, 2012 to resolve any remaining factual disputes.  At trial, the court heard testimony from Vickie J. Friedman, CSX's director of sales and use taxes; Dr. Richard R. Mudge, CSX's expert; Derrick Stephen DuBose, the Department's manager of the motor fuels section;

Jay Starling, the Department's assistant director of the motor vehicle division; and Joe Walls, the Department's director of the sales tax division. *See* doc. 65.

## III.   ANALYSIS

Congress passed the 4-R Act to "'restore the financial stability of the railway system of the United States,' among other purposes. § 101(a), 90 Stat. 33. To help achieve this goal, Congress targeted state and local taxation schemes that discriminate against rail carriers." *CSX Transp.*, 131 S. Ct. at 1105. Accordingly, the 4-R Act establishes that "[t]he following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

> (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

> (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection.

> (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

> (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part."

49 U.S.C. § 11501(b).[8]  Moreover, the Eleventh Circuit instructs that subsection

(b)(4) is a catchall provision intended to "prevent discriminatory taxation of a

railroad carrier by any means," not simply real property-based taxation.  *Ala.*

*Great. S. R.R. Co. v. Eagerton*, 663 F.2d 1036, 1040-41 (11th Cir. 1981); *see also*

*Kan. City S. Ry. v. McNamara*, 817 F.2d 368, 371-74 (5th Cir. 1987).  Thus, while

the legislative history predominately concerned discriminatory property taxes,

Congress "realized near the end that banning discriminatory property taxes was

not enough to save the railroads from unfair state taxation.  Congress therefore

added § 1150[1](b)(4) to ensure that the statute would not fail of its broader

purpose." *McNamara*, 817 F.2d at 373.  *See also CSX Transp.*, 131 S. Ct. at 1107

("'[A]nother tax,' as used in subsection (b)(4), is best understood to refer to all of

these—more precisely, to encompass any form of tax a State might impose, on any

asset or transaction, except the taxes on property previously addressed in

subsections (b)(1)-(3).").  Conversely though, "the purpose of the 4-R Act was *not*

to grant railroads preferential treatment . . . .  Rather, in adopting the 4-R Act,

Congress' purpose was to remedy discrimination against the railroads and place

them on an even playing field with other state taxpayers." *Atchison, Topeka, and*

---

[8] "This provision was originally codified at 49 U.S.C. § 26c (1976 ed.).  In 1978, Congress recodified it at § 11503 (1976 ed., Supp. II), with slightly altered language but 'without substantive change,' §3(a), 92 Stat. 1466.  In 1995, Congress again recodified the section without substantive change, this time to 49 U.S.C. § 11501.  This opinion refers to the statute's current text." *CSX Transp.*, 131 S. Ct. at 1105 n.1.  The court also notes that the 4-R Act specifically empowers federal district courts to grant such injunctive relief and declaratory judgment as may be necessary to prevent, restrain, and terminate any violations of the Act.  *See* 49 U.S.C. 11501(c).

*Santa Fe Ry. Co. v. Arizona*, 78 F.3d 438, 442 (9th Cir. 1996) (emphasis added). Thus, any state "taxation scheme" runs afoul of the 4-R Act if it "discriminates against a rail carrier," and in this context, the Court determined that "'[d]iscrimination' is the 'failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.'" *CSX Transp.*, 131 S. Ct. at 1108 (quoting Black's Law Dictionary 534 (9th ed. 2009)).

Furthermore, under this logic, the Court found that the motor carrier and water carrier *exemptions* to Alabama's generally applicable sales and use tax *could* violate the 4-R Act's prohibition on discriminatory taxation.  Thus, the Court instructed that "[w]e hold only that § 11501(b)(4) enables a railroad to challenge an excise or other non-property tax as discriminatory on the basis of the tax scheme's exemptions . . . . Whether the railroad will prevail—that is, whether it can prove the alleged discrimination—depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers." *Id.* at 1109 n.8.

A.    *Burden of Proof*

Before addressing the merits question, the court finds it necessary to establish the proper burden of proof under the 4-R Act's prohibitions.  The 4-R Act's language only provides in relevant part that "[t]he burden of proof in determining assessed value and true market value is governed by State law." 49 U.S.C. § 11501(c).  However, the terms "assessed value" and "true market value" are only found in the 4-R Act's prohibitions against discriminatory property taxes,

not the catchall provision at issue here. *See id.* at § 11501(b)(1)-(4). Furthermore, while maintaining that a state may justify a seemingly discriminatory tax, the Supreme Court implied that the burden of proof still rests with the plaintiff railroad. *See* 131 S. Ct. at 1109 n.8 ("[w]hether the railroad will prevail—that is, whether it can prove the alleged discrimination . . . ."). Accordingly, as the parties offer no other indication, the court adopts the burden of proof announced by the Eighth Circuit in *Burlington N. R. Co. v. James*, 911 F.2d 1297, 1300 (8th Cir. 1990), that, "[i]n order to succeed on the merits, a plaintiff railroad must prove the discriminatory effects of the tax by a preponderance of the evidence."

B.     *The Comparison Class*

Naturally, any discussion regarding "discrimination" requires some form of comparison class. Put simply, to determine whether an entity is "favored," there must exist a "disfavored" separate and distinct entity. *See Union Pac. R.R. Co. v. Minn. Dep't of Revenue*, 507 F.3d 693, 695 (8th Cir. 2007) ("[A] court must first determine the class of taxpayers with whom the railroads are to be compared."). Here, it appears both parties agree that rail carriers' "competing transportation modes" constitute the proper comparison under the 4-R Act. *See* doc. 68, at 14; doc. 67, at 2; doc. 69, at 2. More specifically, the pertinent issue is whether Alabama's sales and use taxes on diesel fuel discriminate against rail carriers as compared to motor carriers and water carriers based on certain exemptions for these competing transportation modes. *Id.* And indeed, many courts addressing similar tax schemes agree that the "competing mode" comparison is appropriate.

*See Burlington N., Santa Fe Ry. Co. v. Lohman*, 193 F.3d 984 (8th Cir. 1999)

(establishing that "the comparison class should be appropriate to the type of tax

and discrimination challenged in a particular case," and where "railroad companies

are subject to [] generally imposed [sales and use taxes], while their direct

competitors are not," the proper comparison class "is the competitive mode");

*Union Pacific*, 507 F.3d at 695 (holding that, under *Lohman*, the "'competitive

mode' comparison class, which is comprised of the railroads' direct competitors,

was the proper comparison class for ascertaining whether Missouri's sales and use

tax scheme violated § 11501(b)(4)"); *Kan. City S. Ry. Co. v. Bridges*, No. 04-2547,

2007 WL 977552 (W.D. La. March 30, 2007) (same).

C.     *Lohman* and *McNamara*

       CSX relies heavily on the Eighth Circuit's decision in *Lohman* and its

progeny to establish the discriminatory nature of Alabama's sales and use taxes.

*See generally* docs. 61, 68.  In *Lohman* the plaintiff railroad company challenged

Missouri's 4.225% generally applicable sales and use taxes under the 4-R Act, 49

U.S.C. § 11501(b)(4), because the taxes exempted the railroad's major

competitors—trucks and barges.  193 F.2d at 985.  Under the Missouri scheme,

however, trucks paid a fuel excise tax of seventeen cents per gallon, but "[b]arge

lines apparently pay no similar taxes of any kind."  *Id.*  After determining that the

railroad's primary competitors served as the proper comparison class, the court

agreed with the railroad that "only the sales and use taxes should be taken into

account to determine if those sales and use taxes are discriminatory."  *Id.* at 986.

Therefore, the court reasoned that "a state's overall tax structure need not be examined under the 4-R Act even if fair taxing arrangements exist, such as taxing one business with property taxes and another with sales taxes, '"because the actual fairness of those arrangements is too difficult and expensive to evaluate."'" *Id.* (quoting *Trailer Train Co. v. State Tax Comm'n*, 929 F.2d 1300, 1303 (8th Cir. 1991) (quoting *McNamara*, 817 F.2d at 375)). As such, the court concluded that, "[w]ithin the competitive mode class, only railroads pay the tax. Barges and truck are exempt. Accordingly, we hold that Missouri's sales and use tax on fuel violates the 4-R Act." *Id.*

The Eighth Circuit reaffirmed *Lohman* eight years later in *Pacific Union.* In that case, the plaintiff railroad challenged Minnesota's 6.5% sales and use tax imposed on the railroad's purchase or consumption of transportation fuel. 507 F.3d at 694. While two of the railroad's competitors—barges and Great Lakes ships—also paid this tax, the Minnesota tax scheme exempted motor carriers and air carriers "because they pay an excise tax on their transportation fuel purchases." *Id.* The district court found that "'because railroads are subject to the exact same tax as at least two of their competitors, and because all competitors within the comparison class are subject to a tax on fuel,'" there is no discrimination against railroads. *Id.* The Eighth Circuit disagreed and held that *Lohman* "precluded the district court from considering the excise tax the motor carriers and airlines pay on fuel in making its determination." *Id.* at 695. Accordingly, the district court "should have confined its analysis to only the sales and use taxes on transportation

fuel." *Id.*

Furthermore, the United States District Court for the Western District of Louisiana adopted the *Lohman* analysis in *Bridges*, 2007 WL 977552. The court in *Bridges* addressed a similar Louisiana tax scheme as that imposed in Alabama. Louisiana imposed a 4% sales and use tax on the plaintiff rail carrier's diesel fuel, but exempted motor carriers from this tax "if the transportation fuel is subject to the Louisiana fuel excise tax . . . . On-road diesel fuel, including diesel fuel used as transportation fuel by motor carriers, is subject to an excise tax of $.20 per gallon." *Id.* at *2. Louisiana also exempted water carriers engaged in "foreign or interstate commerce" from the 4% sales and use taxes, but the sales and use taxes applied to water carriers involved solely in intrastate commerce. *Id.* The court found that Louisiana's sales and use taxes violated the 4-R Act by discriminating against rail carriers, and citing *McNamara* and *Lohman*, refused to consider "the impact of alternative taxes, such as the excise tax, when assessing the discriminatory impact of sales and use taxes on rail carriers." *Id.* at *6.

In other words, the *Bridges* court declined to ascertain the "equivalency" of the excise tax to the sales and use taxes. *Id.* at *7. Accordingly, the court again cited *McNamara* for the proposition that "'our conclusion is somewhat formalistic. But the 4-R Act is formalistic. And again, we have faith in the abilities of the state tax collectors to reach the pockets of the railroads with taxes that are actually and formally fair.'" *Id.* at *6 (quoting *McNamara*, 817 F.2d at 379). To further support its holding, the *Bridges* court maintained that "'[c]ourts as institutions are

poorly equipped to evaluate with precision the relative burdens of various methods of taxation. The complexities of factual economic proof always present a certain potential for error, and courts have little familiarity with the process of evaluating the relative economic burden of taxes.'" *Id.* at *7 (quoting *Minneapolis Star v. Minn. Comm'r of Revenue*, 460 U.S. 575, 589-90, 103 S. Ct. 1365, 1374, 75 L.Ed.2d 295 (1983) (footnote omitted)). Therefore, when comparing motor carriers with rail carriers, the court concluded, "[t]he diesel fuel used by motor carriers is subject to an excise tax and is therefore exempt from the imposition of the Louisiana sales and use tax. Since the excise tax is not under consideration in the instant evaluation, the Court finds that motor carriers are treated more favorably than rail carriers under the Louisiana sales and use tax structure." *Id.* at *8 (citations omitted).

Finally, the court finds it necessary to discuss the Fifth Circuit's opinion in *McNamara*—the case upon which *Lohman*, *Pacific Union*, and *Bridges* substantially rest. In *McNamara* the court considered a 2% tax that Louisiana imposed on the gross receipts of all "public utilities," including "railroads and railways, sleep cars, motor bus lines, motor freight lines, express companies, telephone companies, telegraph companies, boat or packet lines, and pipe lines." 817 F.2d at 370. The court found that this tax discriminated against rail carriers but utilized the comparison class of all "other commercial and industrial taxpayers." *Id.* at 375. Based on this comparison class, *and explicitly rejecting the comparative modes of transportation class*, the court admitted that the 4-R Act

"puts severe limits on the broad discretion usually afforded state taxing authorities . . . . [because] [o]ur holding may preclude the state from putting the railroads into one of these smaller tax classes even if that classification is perfectly fair." *Id.* at 375.  Furthermore, the court held that, when comparing taxes on rail carriers with taxes on "other commercial and industrial taxpayers," the 4-R Act "forbids some fair arrangements because the actual fairness of those arrangements is too difficult and expensive to evaluate." *Id.*  And indeed, as it relates to "other commercial and industrial taxpayers," the court refused to consider "the overall tax burden of the railroads and to compare that burden with all other commercial and industrial taxpayers." *Id.* at 377.  To do so demands "[d]etermining the intrinsic economic fairness of a tax system to a particular taxpayer[,] [] a paradigm of the kind of polycentric problem for which courts are ill-suited." *Id.*

Conversely, when discussing "complimentary" taxes allegedly *not* imposed on railroads, the court stated "[i]t may be that in an appropriate case we would allow a state to save a facially discriminatory tax by showing that it is *necessary* to 'compensate' for some state or local tax—a tax applicable to 'other commercial and industrial' taxpayers—that for some reason *cannot* be levied against the railroads." *Id.* at 376 (emphasis in original).  However, the facts presented to the court revealed that the secretary of the department of revenue was actually suing the plaintiff railroad company for underpayment of this purported complimentary tax. *Id.*

To conclude, this courts notes a significant fallacy with the *Lohman* cases'

reliance on *McNamara* for the proposition that courts should refuse to analyze a state's entire tax scheme. *See Lohman*, 193 F.3d at 986; *Union Pacific*, 507 F.3d at 695-96; *Bridges*, 2007 WL 977552, at *6-8. In *McNamara*, the Fifth Circuit found that "other commercial and industrial taxpayers," *not* the competitive modes, constitute the proper comparison class. 817 F.2d at 375. As such, the Fifth Circuit found that evaluating the entire cumulative nature and effect of a state's tax scheme on *this* large comparison class would impose substantial theoretical and practical difficulties on a court. However, the *Lohman* cases adopted a much smaller comparison class for purposes of ascertaining whether a state's tax scheme discriminates against rail carriers—the competitive mode class. *See Lohman*, 193 F.3d at 984; *Union Pacific*, 507 F.3d at 695; *Bridges*, 2007 WL 977552, at *7. Thus, the use of *McNamara* to support a purported inability to perform the comparison task seems strained when the comparison class is drastically reduced. This court, therefore, refuses to blindly adopt the conclusion in *McNamara* since the parties here agree on a different class for comparison purposes—the competitive mode class, not the "all other commercial and industrial taxpayers" class.

D.    *The Supreme Court's Decision*

As previously stated, in *CSX Transportation*, the Court found that Alabama's sales and use taxes constitutes "another tax" for purposes of the 4-R Act, and, as such, CSX may raise a § 11501(b)(4) challenge to the various exemptions that Alabama's tax scheme grants. 131 S. Ct. at 1114. This much is

uncontroversial.  However, for purposes here, the Court also offered numerous indications regarding *how* a district court should approach the merits based determination—or, whether the tax scheme, in fact, discriminates against rail carriers.  Implicit in the Court's holding that exemptions for competitors may create discriminatory treatment is the understanding that the district court must undertake a thorough examination of the exemption at issue.  More specifically, "[w]hat the complaint protests is Alabama's imposition of taxes on the fuel CSX uses; what the complaint requests is that Alabama cease to collect those taxes from CSX.  *The exemptions, no doubt, play a central role in CSX's argument: They demonstrate, in CSX's view, that the State's sales and use taxes discriminate against railroads*.  But the essential subject of the complaint remains the taxes Alabama levies on CSX."  *Id.* at 1108 (emphasis added, internal citations omitted). Thus, the Court maintained that "[t]o charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter.  That discrimination continues (indeed, it increases) if the State takes the favored group's rate down to 0%.  And that is all an exemption is."  *Id.* (emphasis added).  Again, the Court's language necessitates reviewing the relative position of both groups—those purportedly favored and those purportedly unfavored—in order to properly assess a claim of discrimination.[9]

_____

[9] CSX also cites *Ariz. Pub. Serv. Co. v. Snead*, 441 U.S. 141, 149-50 (1979), for the proposition that this court may not analyze a "state's total tax structure to determine whether the

Put differently, the Court found that an allegation of discrimination under the 4-R Act inherently allows the party charged with discrimination to justify its differential treatment.  Thus, where a tax applicable to rail carriers contains exemptions, "[t]o say that such a tax . . . does not 'discriminate'—assuming the groups are similarly situated and there is no justification for the difference in treatment—is to adopt a definition of the term ['discriminate'] at odds with its natural meaning."  *Id.* at 1109; *see also id.* at 1109 n.8 ("Whether the railroad will prevail—that is, whether it can prove the alleged discrimination—depends on whether the State offers a sufficient justification for declining to provide the exemption at issue to rail carriers.").  And indeed, the Court acknowledged that "inquiry into discrimination may pose difficulties . . . . Discrimination cases

---

state in fact" discriminates against rail carriers.  Doc. 68, at 15-16.  The court disagrees with CSX's purported analogy to *Snead*.  In *Snead*, the Court rejected a New Mexico tax "on the privilege of generating electricity within its borders" under the Tax Reform Act of 1976.  441 U.S. at 146 (citing 15 U.S.C. § 391).  This federal law prohibited states from "assess[ing] a tax on or with respect to the generation or transmission of electricity which discriminates against out-of-State manufacturers, producers, wholesalers, retailers, or consumers of that electricity." *Id.*  The Court refused to examine New Mexico's entire tax structure to ascertain whether a greater tax burden is imposed on electricity sent out of the state because "the federal statutory provision is direct[ed] specifically at a state tax 'on or with respect to the generation or transmission of electricity,' not to the entire tax structure of the State."  *Id.* at 149.  Thus, the Court only considered taxes on the generation of electricity and not gross receipts taxes.  *Id.* Conversely, here, the 4-R Act provision at issue prohibits "another tax that discriminates against a rail carrier."  49 U.S.C. § 11501(b)(4).  This language contains no similar restrictions as seen in *Snead*, and as a result, opens the door to considering any and all taxes that potentially discriminate against rail carriers.  Put differently, *Snead* requires district courts to "look narrowly at the type of tax the federal statute names."  441 U.S. at 149-50.  Here, the type of tax the federal statute names is "another tax," and "another tax" "as used in subsection (b)(4), is best understood to refer to all of these—more precisely, to encompass any form of tax a State might impose, on any asset or transaction . . . ."  *CSX Transp.*, 131 S. Ct. at 1107.

sometimes do raise knotty questions about whether and when dissimilar treatment is adequately justified." *Id.* at 1114. However, "Congress has directed the federal courts to review a railroad's challenge; and in either case, we would flout the congressional command were we to declare the matter beyond us." *Id.*

In sum, the *CSX Transportation* language seemingly rejects the *Lohman* directive for district courts to avoid considering the extent and purpose of an exemption not available to rail carriers, but available to comparative modes of transportation, because such exercise "is too difficult and expensive to evaluate." *Lohman*, 193 F.3d at 986 (citations and quotation marks omitted). Accordingly, this court must ascertain whether the state adequately justifies the sales and use tax exemptions for rail carrier's principal competitors. And indeed, to adequately answer that question, this court, unlike the *Lohman* cases, finds it necessary to analyze rail carriers' competitors in "all relevant respects."

E.    *Discrimination under the 4-R Act*

CSX contends that certain exemptions from Alabama's sales and use tax scheme granted to motor carriers and interstate / foreign water carriers, but not rail carriers, constitute discrimination against rail carriers. The court will address each competitor in turn.

i.    *Motor Carriers*

Alabama's tax scheme requires CSX to pay a 4% tax on its purchase or consumption of diesel fuel within the state. *See* Ala. Code §§ 40-23-2(1), 40-23-61(a). While this sales and use tax scheme generally applies to all consumers, the

tax scheme exempts purchasers of non-dyed diesel motor fuel, or the fuel used by motor carriers. *See* Ala. Code §§ 40-17-2, 40-17-220(e). The code sections exempting motor carriers from the sales and use taxes impose a 19¢ per gallon excise tax on the diesel fuel purchased by motor carriers. *Id.* ("[M]otor fuel subject to the excise tax levied by this article shall not be subject to any other excise tax levied by the state."). The motor fuels excise tax explicitly exempts users of dyed diesel, the fuel used by rail carriers. *Id.* ("Motor fuel that is indelibly dyed and chemically marked in accordance with regulations issued by the Secretary of the Treasury of the United States under 26 U.S.C. § 4082 shall be exempt from the tax imposed by this section."). Accordingly, to justify the sales and use tax "exemption" provided to motor carriers, but not rail carriers, *see CSX Transp.*, 131 S. Ct. at 1109 n.8, the Department cites the language of the actual exemption that imposes a separate tax on the fuel used by motor carriers. *See* doc. 67, at 4-6. The court finds this justification sufficient under the 4-R Act because the tax rate imposed per gallon of diesel fuel for rail carriers and motor carriers is essentially the same.

Indeed, when comparing the tax rate imposed on diesel fuel by *Alabama*'s 4% sales and use taxes (rail carriers) and *Alabama*'s 19¢ per gallon excise tax (motor carriers), the motor carriers actually pay a higher rate. *See* doc. 65, at 83-85; Def. Trial Exh. 1 ("Comparison of State Sales Taxes Paid on Dyed Diesel Fuel to State Motor Fuels Tax on Undyed Diesel Fuel"). The evidence demonstrates that from January 26, 2007 through December 25, 2009, motor carriers paid more

per gallon of diesel fuel (average price per gallon + 19¢ per gallon) than rail carriers (average price per gallon + 4% sales tax per gallon). *Id. See also CSX Transp.*, 131 S. Ct. at 1108.

Moreover, even when factoring the local (city and county) sales and use taxes imposed on rail carriers's diesel fuel,[10] rail carriers and motor carriers paid similar rates per gallon of diesel fuel from January 2007 through December 2009. In fact, based on CSX's evidence produced at trial, when adding the average local sales tax to the price per gallon of rail carriers' diesel fuel (in addition to the state tax), rail carriers paid more per gallon of diesel fuel than motor carriers in November 2007 through November 2008 and November 2009 through December 2009, but motor carriers paid more per gallon in January 2007 through October 2007 and December 2008 through October 2009.  Doc. 65, at 29; Pla. Trial Exh. 1. And indeed, these calculations fail to account for the local excise taxes imposed on motor carriers per gallon purchased of undyed diesel fuel.  Doc. 65, at 30-31; *id.* at 60 (testimony from Steve DuBose, manager of the Department's motor fuels section, that local taxes on clear diesel fuel range from one (1) to six (6) cents per gallon).  Thus, the Department's justification for the exemption survives

_____

[10] The Department argues against this analysis because "the Department does not act in concert with nor does it administer, collect, monitor, enforce or provide legal services for the localities where CSX[] pay sales and/or use taxes."  Doc. 67, at 7 n.1.  The court disagrees because the 4-R Act specifically prohibits "a State, subdivision of a State, or authority acting for a State or subdivision of a State" from imposing discriminatory taxes, 49 U.S.C. § 11501(b), and Alabama's tax scheme explicitly authorizes these localities to impose sales taxes that parallel state sales taxes except the provisions relating to the tax rate.  Ala. Code §§ 11-3-11.2, 11-51-200 through 204, 40-12-4.

scrutiny—motor carriers receive an exemption from paying Alabama's sales and use taxes on diesel fuel *because* they pay a comparable excise tax on this fuel, a tax not imposed on rail carriers.  The two competitors pay a substantially similar tax rate on diesel fuel and, accordingly, neither transportation mode is unjustifiably favored.

In sum, the court acknowledges that the tax rate paid on diesel fuel by rail carriers and motor carriers is not precisely the same; however, as the rates are substantially similar, the court finds any differences sufficiently justified, and, most importantly, the court finds that these differences offer no favoritism to motor carriers as opposed to rail carriers.  As such, CSX failed to meet its burden of proof that it suffered from discrimination.  *See Burlington N.*, 911 F.2d at 1300.

Furthermore, while the court finds it necessary to consider the tax rate per gallon of diesel fuel paid by rail carriers compared with motor carriers, the court declines CSX's invitation to also consider how the state of Alabama spends its tax revenue.  CSX contends that the excise tax imposed on motor carriers "results in an important tangible benefit to the motor carriers in the form of a network of well-maintained roads and bridges . . . while railroads receive no such benefit from the tax they pay since they must build, maintain, and pay taxes on their rail network from their own resources."  Doc. 68, at 18.  Accordingly, CSX concludes, the excise tax "provides a distinct competitive advantage for the trucking industry relative to its largest competitor, i.e., the railroads."  *Id.* (citing doc. 65, at 41-42 (trial testimony of Dr. Richard R. Mudge)).  However, CSX's contention misses

the mark because it pertains to discretionary spending by a state—not a discriminatory tax as prohibited by the 4-R Act.  Moreover, the comparison is inapt because CSX's rail network is a private network and is restricted from the general public.  In contrast, motor carriers use public roads.  As such, any benefit the motor carriers receive from the well maintained roads is due simply to the fact that the state must maintain the roads for the general public.  In other words, absent evidence that the state uses the fuel tax motor carriers pay to maintain private restricted access roads used exclusively by motor carriers, CSX's example misses the mark.  In fact, at trial, the Department provided that motor carriers' fuel used for "off road" or non-public road purposes is taxed the same as CSX's fuel.  Doc. 65, at 29-30; *see also* Ala. Code § 40-17-2(3).  Like CSX, these motor carriers are responsible for maintaining their own private infrastructure.  Thus, when the comparison is made to motor carriers that are actually similarly situated to CSX in all respects, CSX's contentions fall flat.

Furthermore, the 4-R Act's first three prohibitions pertain to the assessment and value of rail transportation property and the property tax rates applied to this property; however, the Act provides no limitation or instruction for a state or locality's spending of the property tax revenues.  *See generally* 49 U.S.C. § 11501.  As such, the court refuses to read into subsection (b)(4) any directive regarding a state's spending of revenue from "another tax" that it collects from rail carriers, assuming the tax is collected through non-discriminatory means.  Even though the proceeds from the motor fuel excise tax are directed to the Alabama Department of

Transportation and localities for the construction, repair, maintenance, and operation of public roads and bridges—as opposed to the state's education and general funds for the sales and use taxes, *see* Ala. Code §§ 40-23-35, 40-23-85; doc. 65, at 87—both motor carriers and rail carriers maintain comparable tax rate burdens on the diesel fuel purchased.

To find differently under the 4-R Act would grant rail carriers unparalleled control over state spending, a result certainly not intended by Congress. State and local governments spend public money, or tax revenue, for public purposes such as maintenance and construction of public roads and bridges. *See Carmichael v. S. Coal & Coke Co.*, 301 U.S. 495, 514 (1937) ("[S]ince the adoption of the Fourteenth Amendment state taxing power can be exerted only to effect a public purpose and does not embrace the raising of revenue for private purposes."). Conversely, absent express instruction otherwise, it violates Alabama state law for the state to spend public money to aid private enterprise. *See* Ala. Const. Art. IV, § 93 ("The state shall not . . . be interested in any private or corporate enterprise, or lend money or its credit to any individual, association, or corporation, except as may be expressly authorized by the Constitution of Alabama, or amendments thereto."). Accordingly, CSX's interpretation of the 4-R Act places the state in an untenable dilemma—either amend Alabama law to allow the spending of public money on private railway maintenance, or, stop distributing tax revenue to places of public accommodation such as roads and bridges because this distribution arguably benefits rail carrier's competitors more than rail carriers. And, moreover,

CSX could still claim discrimination under this theory if the state imposed a single 19¢ per gallon excise tax on all diesel fuel but spent more of the revenue on public roads as opposed to private tracks.  The court refuses to impose this choice on the state and finds no basis in the 4-R Act for doing so; rather, the court limits its analysis to the tax rates imposed on the purchase and consumption of diesel fuel between rail carriers and motor carriers.

Similarly, the court finds it unnecessary to analyze the sales and property tax burden CSX suffers for track infrastructure maintenance, repair, and operation. *See* doc. 68, at 18.  At trial, Vickie J. Friedman, CSX's director of sales and use taxes, testified that a proper "burdens" analysis requires consideration of "a property tax on [CSX's] infrastructure and then as well as a sales tax on the parts and material that go into building that infrastructure" because rail carriers must pay to maintain their own infrastructure, a cost not incurred by motor carriers. Doc. 65, at 22.  Again, however, the 4-R Act concerns applicable tax rates, not the gross revenue generated against rail carriers as opposed to the competing modes of transportation.  *See* 49 U.S.C. 11501(b).  Accordingly, the fact that CSX spends more money on track maintenance or owns more real property than motor carriers, and, as such, pays a greater sum to the Department in taxes for these purposes, is not relevant to whether Alabama imposes a discriminatory tax on rail carriers.  Put simply, as rail carriers and motor carriers both pay precisely the same sales and use

tax rate on raw materials and the same property tax rate,[11] doc. 65, at 81, the court finds no evidence of discrimination or favorable treatment.  *See* 49 U.S.C. § 11501(b); *CSX Transp.*, 131 S. Ct. at 1108.

ii.    *Interstate / Foreign Water Carriers*

Alabama's sales and use taxes also exempt "the gross proceeds from the sale or sales of fuel and supplies for use or consumption aboard ships, vessels, towing vessels, or barges, or drilling ships, rigs or barges, or seismic or geophysical vessels, or other watercraft . . . engaged in foreign or international commerce or in interstate commerce," Ala. Code § 40-23-4(a)(10), and the "storage, use or other consumption in this state of . . . [f]uel and supplies for use or consumption aboard ships, vessels, towing vessels, or barges, or drilling ships, rigs or barges, or seismic or geophysical vessels, or other watercraft . . . engaged in foreign or international or in interstate commerce."  Ala. Code § 40-23-62(12). *See, e.g.*, *Bean Dredging, L.L.C. v. Ala. Dep't of Revenue*, 855 So. 2d 513, 519 (Ala. 2003) (holding that company hired to dredge Mobile Bay and Mobile River engaged in "interstate commerce" and therefore should receive an exemption from Alabama's sales tax for its fuel and supplies).  CSX contends that this exemption for interstate water carriers, a principle competitor, also evidences "another tax that discriminates against a rail carrier" because "interstate water carriers pay neither a motor fuel excise tax nor sales tax on their diesel fuel."  *See* doc. 70, at 6.

---

[11] And indeed, if CSX paid a higher property tax rate, the court assumes that CSX's suit would include claims under 49 U.S.C. § 11501(b)(1)-(3).

The parties agree, however, that water carriers involved solely in intrastate transportation are subject to the same sales and use taxes as rail carriers. *See* doc. 63, at 4. *Cf. Ala. Dep't of Revenue v. Midstream Fuel Serv., Inc.*, 521 So. 2d 75 (Ala. Civ. App. 1988) (establishing that this exemption for interstate commerce constitutes a "full exemption," and once the requirements of the exemption are met, the water carrier "is not subject to an apportion[ed] [tax] for use of the Alabama inland waterways during a part of that [interstate] trip or voyage").[12]

The court finds that CSX cannot establish that the taxes it pays compared to water carriers are discriminatory for two reasons. First, CSX fails to meet it evidentiary burden of proof. As previously stated, "[i]n order to succeed on the merits, a plaintiff railroad must prove the discriminatory effects of the tax by a preponderance of the evidence." *Burlington N.*, 911 F.2d at 1300. *See also CSX Transp.*, 131 S. Ct. at 1109 n.8 ("[w]hether the railroad will prevail—that is, whether it can prove the alleged discrimination . . . ."). Here, put simply, CSX offers no evidence regarding the purported discriminatory effect as it relates to water carriers. The stipulated facts merely provide that, according to "an analysis of freight movement published by the United States Department of Transportation, in the year 2002, 82% of freight moved intrastate within Alabama was transported by trucks, 6% by rail, and 1% of freight moved intrastate within Alabama was

---

[12] The court in *Midstream Fuel* disagreed with the Alabama Department of Revenue that the "the sales of fuel and supplies consumed on Alabama inland waters are not exempted from sales tax" under Alabama law because such an apportionment scheme "is just not borne out of the express language of the exemption statute." 521 So. 2d at 77.

transported by water." Doc. 63, at 5. Yet, under Alabama law, water carriers involved in solely intrastate transportation are subject to the same sales and use taxes as rail carriers. *See id.* at 4; Ala. Code §§ 40-23-4(a)(10), Ala. Code § 40-23-62(12). Moreover, CSX offered no evidence at trial regarding the alleged discriminatory effects as it relates to water carriers. *See generally* doc. 65. As CSX retains the burden of proof to establish discrimination, the court refuses to assume a discriminatory effect based solely on CSX's allegations.

Additionally, CSX erroneously asks this court to assume that eliminating Alabama's diesel tax exemptions for interstate / foreign water carriers would survive commerce clause scrutiny. The court refuses to engage in this advisory speculation, and, accordingly, finds rail carriers and interstate / foreign water carriers not "the same in all relevant respects." *See CSX Transp.*, 131 S. Ct. at 1108. It is now axiomatic that no federal or constitutional rule categorically prevents Alabama from requiring interstate / foreign water carriers to pay an apportioned share of taxes for activities occurring within the state—"interstate commerce may be made to pay its way." *See Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 288 (1977). Furthermore, to test the constitutionality of a state tax on interstate commerce, courts apply the four part *Complete Auto* test: whether the tax "'[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.'" *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 183 (1995) (quoting *Complete*

*Auto*, 430 U.S. at 279).  When a state tax involves international commerce, the Court further provided that, to withstand commerce clause scrutiny, "a court must also inquire, first whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 451 (1979).  *See also Made in the USA Foundation v. United States*, 242 F.3d 1300, 1317-18 (11th Cir. 2001).

Thus, taxing interstate / foreign water carriers' diesel fuel in Alabama's navigable waterways requires a complex analysis involving, among other things, proper apportionment, risk of multiple international taxation, and international comity—factors not present with rail carriers in Alabama.  In other words, the court cannot assume that by merely eliminating the exemption for interstate / foreign water carriers, such taxation scheme would survive commerce clause scrutiny.  Upon review, a court may find that such taxation impermissibly burdens interstate and international commerce thereby re-requiring the exemption for these water carriers.  As such, the court finds CSX's argument that rail carriers and interstate / foreign water carriers are similarly situated in all relevant respects too speculative—taxation of these water carriers requires a separate and distinct commerce clause analysis.  Thus, absent any other evidence from CSX to the contrary, *see supra*, this is a sufficient rationale basis for the Alabama legislature's differential treatment of rail carriers and interstate / foreign water carriers.

## IV.   CONCLUSION

The Supreme Court mandated that CSX prove the differential treatment rail carriers face in Alabama's sales and use tax scheme is, in fact, discriminatory.  As the Department sufficiently demonstrates that rail carriers are not unjustifiably disfavored as it relates to the purchase and use of diesel fuel, the court finds no discrimination under the 4-R Act.  The court will enter an order consistent with this Memorandum Opinion dismissing the matter with prejudice.

**DONE** the 24th day of August, 2012.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE