FILED
2017 Mar-29  AM 10:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **CSX TRANSPORTATION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action Number |
| | ) | **2:08-cv-00655-AKK** |
| **ALABAMA DEPARTMENT OF** | ) | |
| **REVENUE and JULIE P. MAGEE,** | ) | |
| **Commissioner of the Alabama** | ) | |
| **Department of Revenue,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

CSX Transportation, Inc. filed this action against the Alabama Department of Revenue and Julie P. Magee, in her official capacity as Commissioner of the Department (collectively, "the State" or "Alabama"), seeking relief under Section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 11501 (the "4-R Act"). Doc. 1. The 4-R Act, enacted in part to "foster competition among all carriers by railroad and other modes of transportation," 45 U.S.C. § 801(b)(2), prohibits states and localities from engaging in discriminatory taxation of railroads. *See* 49 U.S.C. § 11501(b). CSX contends that Alabama's taxing scheme is discriminatory because the State exempts motor carriers and water carriers from the diesel fuel sales tax it requires railroads to pay.

Accordingly, CSX seeks to enjoin the State from collecting sales tax on CSX's diesel fuel purchases pursuant to § 11501(b)(4).

After considering the evidence presented at trial and the parties' post-trial briefs, for the reasons provided herein, the court concludes that the State has not violated the 4-R Act and that this action is due to be dismissed with prejudice.

## I.    RELEVANT PROCEDURAL HISTORY

The court initially dismissed CSX's complaint based on the Eleventh Circuit's determination, in a similar case, that "the Alabama tax statute . . ., with its exemptions for motor and water carriers, does not offend the 4-R Act so long as the tax is generally applicable and does not target railroads within Alabama." *See* doc. 22 (citing *Norfolk S. Ry. v. Ala. Dep't of Revenue*, 550 F.3d 1306, 1316 (11th Cir. 2008)).  The Eleventh Circuit, "bound by the panel's decision in *Norfolk Southern*," affirmed, 350 F. App'x 318 (2009).  The Supreme Court reversed, stating that "CSX may challenge Alabama's sales and use taxes as 'tax[es] that discriminat[e] against . . . rail carrier[s]' under § 11501(b)(4),"[1] and remanded for

---

[1] As the Court explained,

> To charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter. That discrimination continues (indeed, it increases) if the State takes the favored group's rate down to 0%.  And that is all an exemption is.

*CSX I*, 562 U.S. at 287.

further proceedings.  562 U.S. 277, 296 (2011) ("*CSX I*") (alterations and ellipsis in original).

Consistent with the remand from the Eleventh Circuit for this court to conduct further proceedings in light of *CSX I*, 639 F.3d 1040, 1041 (11th Cir. 2011), this court conducted a bench trial in April 2012.  After the trial, this court held that:  (1) Alabama's motor carrier exemption was not discriminatory, because motor carriers pay a fuel-excise tax at a rate that is "essentially the same" as the sales tax rate, doc. 71 at 23; and (2) CSX failed to demonstrate a discriminatory impact from the State's disparate tax treatment of rail carriers vis-à-vis water carriers, *id.* at 30.  CSX appealed, and the Eleventh Circuit reversed, holding that Alabama could not justify the disparate sales tax treatment by arguing that another tax, such as the motor fuel-excise tax, "level[s] the playing field."  720 F.3d 863, 871 (11th Cir. 2013).[2]

On the State's petition, the Supreme Court again agreed to hear the case. 134 S. Ct. 2900 (2014).  The Court reversed in part,[3] stating, "[t]here is simply no discrimination when there are roughly comparable taxes."  ___U.S.___, 135 S. Ct.

---

[2] The Eleventh Circuit did not examine the State's other justifications for the water carrier exemption, but instead stated that "water carriers, who pay not a cent of tax on diesel fuel, are the beneficiaries of a discriminatory tax regime."  720 F.3d at 871.

[3] The Court held that "[t]he Eleventh Circuit properly concluded that, in light of CSX Transportation's complaint and the parties' stipulation, a comparison class of competitors consisting of motor carriers and water carriers was appropriate, and differential treatment vis-à-vis that class would constitute discrimination."  *CSX II*, 135 S. Ct. at 1143.

1136, 1144 (2015) ("*CSX II*").  The Court opined that "an alternative, roughly equivalent tax is one possible justification that renders a tax disparity nondiscriminatory," and remanded the action for consideration of "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales tax as applied to diesel fuel, and therefore justifies the motor carrier sales-tax exemption," and whether the State's "other justifications for the water carrier exemption," which the "Eleventh Circuit failed to examine," were sufficient.  *Id.*

The Eleventh Circuit remanded the action to this court for further proceedings consistent with *CSX II*.  797 F.3d 1293, 1294 (11th Cir. 2015).  This court conducted a second bench trial, and, with the benefit of the parties' post-trial briefs, *see* docs. 154; 155; 156, this matter is ripe again for adjudication.

## II.    SCOPE OF THE REMAND

Before proceeding to the analysis, this court must address the scope of the remand, because the law of the case doctrine bars this court from considering issues the appellate courts have already decided, even if only by necessary implication.  *See Burger King Corp. v. Pilgrim's Pride Corp.*, 15 F.3d 166, 169 (11th Cir. 1994).  However, this court "is free to address, as a matter of first impression, those issues not disposed of on appeal."  *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1271 (11th Cir. 2015).

4

Relevant here, the Supreme Court directed the Eleventh Circuit to consider "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales tax as applied to diesel fuel, and therefore justifies the motor carrier sales-tax exemption," and to determine the sufficiency of the State's "alternative rationales [to] justify its [water carrier] exemption." *CSX II*, 135 S. Ct. at 1144.  At trial, the State presented evidence which, it claims, "prove[s] every theory to deny CSX relief that was mentioned in the Supreme Court's majority opinion in *CSXT II*, in Justice Thomas and Ginsburg's dissenting opinion, and/or by a Justice during oral argument."  Doc. 155 at 7 (emphasis omitted).  In other words, the State introduced evidence not only to show sufficient justification, but also to prove:  that any "discrimination" is self-imposed through rail carriers' practice of purchasing dyed, rather than clear, fuel; that rail carriers and water carriers are not "similarly situated"; and that CSX has sustained no competitive injury through the State's exemption of water carriers from the sales tax.

CSX contends that these issues are outside the scope of remand.  CSX's Br. at 7.[4]  Specifically, as to the clear fuel issue, CSX points out that Justice Thomas discussed "self-imposed discrimination" in his dissent, *see CSX II*, 135 S. Ct. at 1145 (Thomas, J., dissenting) ("The only relevant good exempted from the tax is

---

[4] Page citations to the parties' post-trial briefs refer to the original (as opposed to the electronically-stamped) pagination in order to provide consistency between the State's brief, doc. 155, and CSX's brief, which CSX did not file electronically.

diesel on which the motor fuel tax has been paid, . . . and no provision of law prevents rail carriers from buying such diesel."); *id.* at 1149 ("As far as I can tell, the rail carriers use dyed diesel fuel that is exempt from the motor fuel tax — and therefore subject to the sales and use taxes — as a matter of choice rather than necessity."). According to CSX, the majority's silence on this issue amounts to "an unmistakable rejection of the dissent's clear fuel argument that this Court cannot review further." CSX's Br. at 14. This court declines to find that the majority decided this issue through silence.[5]

Turning next to the second issue regarding water carriers, although the State agrees that the Court impliedly decided that rail carriers and water carriers are similarly situated through its declaration (based on CSX's "complaint and the parties' stipulation") that "differential treatment" vis-à-vis rail carriers and a "comparison class of competitors consisting of motor carriers and water carriers" would "constitute discrimination," *CSX II*, 135 S. Ct. at 1143; *see* State's Reply Br. at 3, the State nonetheless asserts that this court may decide whether rail carriers and water carriers are actually similarly situated. According to the State,

---

[5] *See Gonzalez v. Arizona*, 624 F.3d 1162, 1200 (9th Cir. 2010) ("[I]t is peculiar indeed to impute a *holding* to the majority on an issue it never addressed, because it chose not to follow the contrary reasoning of the dissent. A dissent has no precedential value, and the majority is surely not obligated to address every argument made there. It is obviously dangerous to infer that the majority ruled on a matter as to which it never expressed an opinion. By that peculiar reasoning, a majority can be held to have decided an issue . . . when it never said a word on the subject.") (emphasis in original, citation omitted).

the July 2016 trial "produce[d] substantially different evidence" as to this issue, which triggers an exception to the law of the case doctrine.  State's Br. at 25–26 (quoting *Mega Life & Health Ins. Co. v. Pienozek*, 585 F.3d 1399, 1405–06 (11th Cir. 2009)).

The "substantially different evidence" exception "is inapplicable where[,] by the prior appeal[,] the issue is not left open for decision."  *See This That & the Other Gift & Tobacco, Inc. v. Cobb County*, 439 F.3d 1275, 1285 (11th Cir. 2006) (quoting *Nat'l Airlines, Inc. v. Int'l Assoc. of Machinists & Aerospace Workers*, 430 F.2d 957, 960 (5th Cir. 1970)).  Here, however, in response to the State's argument that "resolution" was not appropriate, Eleventh Circuit case no. 12-14611, State's Br. at 16, and the State's request that the Eleventh Circuit remand the action for this court "to hold hearings and make findings about interstate water carriers," *id.*, the Circuit remanded.  Based on this procedural history, the court finds that the Circuit left the "similarly situated" issue open for decision.

The final issue of contention regarding the scope of the remand centers on the *de minimis* competition/lack of competitive injury issue.  The Supreme Court did not decide this issue.  Instead, it remanded this action for examination of the State's "other justifications for the water carrier exemption."  *CSX II*, 135 S.Ct. at 1144.  Although CSX correctly points out that the State stipulated that trucks and water carriers are CSX's "principal competitors," doc. 137 at 3, this stipulation

does not equate to a concession that the competition between CSX and water carriers is substantial.  *See* State's Reply Br. at 11.  Therefore, because this court is "free to address, as a matter of first impression, those issues not disposed of on appeal," *Cox*, 794 F.3d at 1271, and to avoid another remand in the event the Circuit sides with the State on the scope of the current remand, the court will make findings and enter legal conclusions on this issue based on the evidence.

## III.   FINDINGS OF FACT[6]

The Alabama Department of Revenue administers and collects taxes within the State, including sales and use taxes.  Doc. 137 at 1.  The State levies a generally-applicable sales tax on the gross proceeds from "the business of selling at retail any tangible personal property whatsoever" at "an amount equal to four percent . . . ."  Ala. Code §§ 40-23-2(1), 40-23-61(a) (1975).[7]  Rail carriers pay this sales tax when they purchase dyed diesel.  However, when rail carriers purchase clear diesel, like motor carriers, they instead pay a 19¢ per gallon fuel-excise tax and are exempted from the sales tax.  Trans. 36–38.[8]

---

[6] The State's motion *in limine*, doc. 125, is **GRANTED** as to state tax expenditures and taxes on items other than diesel fuel, and **DENIED** as to local taxes on the sale or use of diesel fuel.

[7] Additionally, counties and municipalities may impose sales and use taxes that correspond to, and parallel the State's.  Doc. 137 at 2–3; Ala. Code §§ 11-3-11.2, 11-51-200 through 11-51-204, 40-12-4 (1975).

[8] Citations to the transcript refer to docs. 138–141.

From a mechanical standpoint, CSX trains can operate on dyed or clear diesel.  Trans. 17, 22, 540.  CSX's fuel suppliers sell both types, and the trucks that deliver CSX's fuel are equipped to transport either type.  Trans. 552.  Nonetheless, the use of dyed diesel in railroad locomotives is a "decades"-long industry practice, recognizing a traditional distinction between clear diesel (used for highways) and dyed diesel (used for off-highway purposes).  Trans. 532.  CSX would encounter various administrative difficulties if it attempted to transition back-and-forth between the two types — based on the fluctuating price of fuel — in an effort to optimize its tax burden.  Trans. 526–36.

Motor carriers and water carriers are CSX's principal competitors in the transportation of property in interstate commerce in Alabama.[9]  Doc. 137 at 3. Motor carriers use clear diesel.  *Id.*  As a result, the State effectively exempts motor carriers from sales and use taxes on their fuel.  *Id.*  Instead, motor carriers pay the 19¢ per gallon fuel-excise tax.  *Id.* at 5.  On average, clear diesel users (*i.e.*, motor carriers and CSX for its vehicles) and dyed diesel users (*i.e.*, rail carriers) paid the following per gallon taxes from January 2007 through February 2016:

---

[9]  "Motor carriers" refers to on-highway motor carriers of property in interstate commerce.  Doc. 137 at 3.  "Water carriers" refers to carriers of property in interstate commerce by ships, barges, and other vessels.  *Id.*

|  | State | State + Local |
|---|---|---|
| **Undyed diesel fuel-excise tax** | 19¢ | 23¢[10] |
| **Dyed diesel sales tax** | 9.85¢ | 23.48¢ |

State's Exs. 1–2.   Moreover, in the 114 months between January 2007 and February 2016, the two taxes exceeded each other at an equal rate, *i.e.*, 57 times each.  State's Ex. 2.

Water carriers are exempted from both types of taxes for their diesel fuel. Doc. 137 at 3.  Instead, water carriers pay a 29.1¢ per gallon federal tax on fuel used in a vessel in commercial waterway transportation, with 29.0¢ of that amount earmarked for the Inland Waterways Trust Fund.  26 U.S.C. § 4042(b).

In contrast to rail carriers and motor carriers, water carriers impose virtually no financial burden on the State.  The federal government funds and performs all river dredging and lock and dam maintenance projects.  *See* State's Ex. 44 at 73– 75; Trans. 63, 96–97, 130–34, 149, 348, 363, 371.  Half of the cost of construction and rehabilitation projects on Alabama's inland waterways is paid out of the Inland Waterways Trust Fund, while funds from the United States Treasury cover the remaining half.  26 U.S.C. § 9506(c); State's Ex. 44 at 85–89.  The State also bears no burden stemming from accidents involving water carriers.  Specifically, from

---

[10] *See infra* note 15.

2004 to 2013, no interstate water carrier collided with an Alabama citizen; however, there were 703 "train-involved" automobile accidents in Alabama, resulting in 92 deaths and 316 casualties. State's Ex. 5 at 26. The Alabama Department of Transportation ("ALDOT"), the Alabama Department of Environmental Management ("ADEM"), and the Alabama Law Enforcement Agency ("ALEA") expended state funds responding to and investigating these incidents involving rail carriers. Trans. 69–70. The State does not budget funds for commercial water traffic regulation or enforcement. Trans. 124, 149.

Lastly, although the parties stipulated that water carriers are one of CSX's two principal competitors in Alabama, the evidence showed a lack of substantial competition between water carriers and CSX. For example, in 2014, CSX's top five commodities shipped into or from Alabama were coal (36.7%), minerals (12.1%), agriculture (9.1%), forest (8.9%), and intermodal (8.5%). CSX's Ex. 50 at 5. In the largest category for CSX's business in Alabama, water carriers offer no competition. Specifically, CSX makes two interstate coal shipments in Alabama: the first from Central Appalachia to Birmingham, Alabama, and the second from Oak Grove, Alabama to Chicago, Illinois. CSX's Exs. 39, 44; Trans. 645–47, 674–67, 683–849. Water carriers do not haul coal from Central Appalachia to Birmingham, Trans. 694, and CSX only competes with motor carriers to haul coal along that route, Trans. 663, 665. Water carriers also provide no competition for

11

the transportation of coal to Chicago — CSX competes with Norfolk Southern Railway to haul coal along this route.  Trans. 687.  The only competition provided by water carriers is in the agricultural products sector, where CSX competes with water carriers to ship between 50,000 and 100,000 carloads of agricultural products per year from Indiana, Ohio, and Illinois to locations in North Alabama.  Trans. 597–602, 614–22.

## IV.   CONCLUSIONS OF LAW

Based on the findings of fact and the relevant law, the court examines the State's clear fuel argument and the State's proffered justifications for any purported disparate tax treatment of rail carriers vis-à-vis motor carriers and water carriers, and makes the following conclusions of law.

### A. The Alleged Discrimination is Self-Imposed Based on CSX's Decision to Purchase Dyed Diesel Rather than Clear Diesel for its Trains

It is undisputed that CSX's locomotives can operate on clear diesel. Moreover, if CSX purchases this fuel, Alabama will subject CSX to the same fuel-excise tax as motor carriers.  *See* Trans. 17, 22, 36–38, 540.  Consequently, the State asserts that any purported discrimination in its taxing scheme is self-imposed. CSX contends that the State's contention is unrealistic because of CSX's established practice of purchasing dyed fuel and the administrative burdens CSX would encounter in attempting to calibrate its usage of dyed and clear diesel to minimize its tax obligations in Alabama.  To support its contention, CSX cites

*Kraft Gen'l Foods, Inc. v. Iowa Dep't of Revenue*, 505 U.S. 71 (1992), for the proposition that "a state cannot force a taxpayer to conduct his business differently, particularly where the taxpayer's practices 'are supported by legitimate business reasons.'" *See* CSX's Br. at 17. However, because the holding in *Kraft* is narrower than CSX asserts and addresses taxation of foreign commerce,[11] the court declines to construe *Kraft* to support a position that it forecloses the State from asserting that CSX can eliminate the purported discriminatory tax if it changed the fuel type it uses for its locomotives. Accordingly, based on the evidence at trial, because CSX can use clear fuel in its trains, and the State does not mandate that CSX use dyed diesel, this court finds that the State has established that its tax schemes for dyed diesel and clear diesel do not discriminate against rail carriers.

To the extent that this ruling exceeds the scope of the remand, for the reasons explained in section B below, the court finds also that motor carriers' payment of the fuel-excise tax is roughly equivalent to the sales tax on dyed diesel, and that the fuel-excise tax sufficiently justifies any disparate sales tax treatment by the State.

---

[11] *See* 505 U.S. at 78 ("Whether or not the suggested methods of tax avoidance would be practical as a business matter, and whether or not they might generate adverse tax consequences in other jurisdictions, we do not think that a State can force a taxpayer to conduct its foreign business through a domestic subsidiary in order to avoid discriminatory *taxation of foreign commerce*.") (emphasis added).

**B. The State Provides Sufficient Justification for Exempting Motor Carriers from the Sales Tax**

　　1. <u>The Proper Standard for Comparing the Sales Tax and Fuel-Excise Tax</u>

The court must ascertain as an initial matter what "rough equivalent" means. *See CSX II*, 135 S. Ct. at 1144 (directing the court on remand to examine "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales tax as applied to diesel fuel, and therefore justifies the motor carrier sales-tax exemption"). To no surprise, the parties propose different interpretations, with the State contending that "rough equivalent" bears its plain meaning — *i.e.*, that the State only has to show that the fuel-excise tax approximates the sales tax, *see* State's Br. at 7–9, and CSX countering that the Court's use of the phrase "rough equivalence" is a directive to apply the "compensatory tax doctrine," CSX's Br. at 21. The court disagrees with CSX.

The Court has summarized the "compensatory tax doctrine" as follows:

> Since [*Henneford v.*] *Silas Mason*[, 300 U.S. 577 (1937)], our cases have distilled three conditions necessary for a valid compensatory tax. First, "a State must, as a threshold matter, 'identify . . . the [intrastate tax] burden for which the State is attempting to compensate.'" *Oregon Waste* [*Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93,] 103 [(1994)] (quoting *Maryland v. Louisiana*, 451 U.S. 725, 758 (1981)). Second, "the tax on interstate commerce must be shown roughly to approximate — but not exceed — the amount of the tax on intrastate commerce." *Oregon Waste*, 511 U.S. at 103. "Finally, the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive

'proxies' for each other." *Ibid.* (quoting *Armco, Inc. v. Hardesty*, [467 U.S. 638, 643 (1984)]).

*Fulton Corp. v. Faulkner*, 516 U.S. 325, 332 (1996).   Although *CSX II* contains no citations to *Faulkner*, *Silas Mason*, *Oregon Waste Systems*, *Maryland*, or *Hardesty*, and the Supreme Court did not include the words "compensatory" or "complementary" in its opinion, CSX insists that the Court prescribed application of the three-part test by citing *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 479–80 (1932).   *See* CSX's Br. at 21.

Turning briefly to *Gregg Dyeing*, the case involved a bleachery operator in South Carolina who purchased its gasoline from out-of-state dealers.   *Gregg Dyeing*, 286 U.S. at 475.   South Carolina exacted a sales tax on the bleachery's purchases, while exempting other taxpayers' out-of-state gasoline purchases.   *Id.* at 473.   The bleachery sued under the Commerce and Equal Protection Clauses.   *Id.* The Court, noting that other taxpayers that purchased or produced gasoline within South Carolina paid the tax at the same rate in relation to gasoline consumption, found no constitutional violation:

> The state court answered the contention as to discrimination against interstate commerce by referring to other statutes of the State imposing a tax upon the sale and use of gasoline within the State. . . . But appellants question the right to invoke other statutes to support the validity of the Act assailed.  To stand the test of constitutionality, they say, the Act must be constitutional "within its four corners," that is, considered by itself.  This argument is without merit.  The question of constitutional validity is not to be determined by artificial standards.  What is required is that state action, whether through one

agency or another, or through one enactment or more than one, shall be consistent with the restrictions of the Federal Constitution. There is no demand in that Constitution that the State shall put its requirements in any one statute.

*Id.* at 479–80.[12]

In *CSX II*, the Supreme Court cited *Gregg Dyeing* only once, after this sentence: "Our negative Commerce Clause cases endorse the proposition that an additional tax on third parties may justify an otherwise discriminatory tax." *CSX II*, 135 S. Ct. at 1143. The Court's negative Commerce Clause jurisprudence (including *Faulkner*, *Silas Mason*, *Oregon Waste Systems*, *Maryland*, and *Hardesty*) addresses scenarios in which a state unjustifiably attempts to "discriminate against or burden the *interstate flow* of articles of commerce," by means of "differential treatment of *in-state* and *out-of-state* economic interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 98–99

---

[12] *CSX II* echoed this discussion eighty-two years later:

> CSX claims that because the statutory prohibition forbids "impos[ing] another tax that discriminates against a rail carrier," 49 U.S.C. § 11501(b)(4) — "tax" in the singular — the appropriate inquiry is whether the challenged *tax* discriminates, not whether the tax code as a whole does so. It is undoubtedly correct that the "tax" (singular) must discriminate — but it does not discriminate unless it treats railroads differently from other similarly situated taxpayers without sufficient justification. A comparable tax levied on a competitor may justify not extending the competitor's exemption from a general tax to a railroad. It is easy to display the error of CSX's single-tax-provision approach. Under that model, the following tax would violate the 4-R Act: "(1) All railroads shall pay a 4% sales tax. (2) All other individuals shall also pay a 4% sales tax."

135 S. Ct. at 1143–44 (alteration and emphasis in original).

16

(emphasis added).  This court does not believe this doctrine is implicated here, where the Alabama tax scheme at issue draws no distinction between in-state and out-of-state interests in its exemption of motor carriers from the sales tax rail carriers pay for their dyed fuel.  Therefore, in light of the Court's failure to explicitly call for application of the compensatory tax doctrine, and because negative Commerce Clause jurisprudence would not provide a useful framework for comparing rail carriers and motor carriers, this court believes the citation to *Gregg Dyeing* stands for the basic, generalized proposition that courts should screen an allegedly discriminatory tax in context with other aspects of a state's tax code.[13]

---

[13] As best as this court can discern, the Supreme Court has only applied the three-part compensatory tax doctrine in negative Commerce Clause cases.  *See, e.g.*, *S. Cent. Bell Tel. Co. v. Ala.*, 526 U.S. 160 (1999); *Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564 (1997); *Fulton Corp. v. Faulkner*, 516 U.S. 325 (1996); *Or. Waste Sys. v. Dep't of Envt'l Quality*, 511 U.S. 93 (1994); *Associated Indus. v. Lohman*, 511 U.S. 641 (1994); *Chem. Waste Mgmt. v. Hunt*, 504 U.S. 334 (1992); *American Trucking Ass'ns v. Scheiner*, 483 U.S. 266 (1987); *Maryland v. Louisiana*, 451 U.S. 725, 758 (1981).  CSX does not direct this court to cases outside this context in which a court has used the three-part test.

CSX mentions that, in *Comptroller of the Treasury of Maryland v. Wynne*, 135 S. Ct. 1787, 1803 n.8 (2015), a case the Supreme Court heard during the same term as *CSX II*, the Court described "compensatory" taxes as "rough equivalents imposed upon substantially similar events."  CSX's Br. at 24.  Thus, according to CSX's logic, because the reference to "substantially similar events" is a component of the three-part test, "roughly equivalent" is a call to apply the three-part test.  However, *Wynne* is a negative Commerce Clause case, and CSX omits the quoted language's context: "independent taxes on intrastate and interstate commerce are 'compensatory' if they are rough equivalents imposed upon substantially similar events." 135 S. Ct. at 1803 n.8.

CSX also contends that the Alabama Supreme Court has cited *Gregg Dyeing* as "shorthand" for the compensatory tax doctrine.  CSX's Br. at 24.  As an initial matter, the Alabama Supreme Court's interpretation of federal common law is not binding on this court.

For these reasons, the court will proceed according to the plain language of the remand order, and analyze whether the fuel-excise tax paid by motor carriers is "roughly equivalent" to the sales tax paid by rail carriers for dyed diesel.

2. Application of the "Rough Equivalence" Standard

In a minor departure from this court's 2012 opinion, *see* doc. 71 at 24, the court is persuaded by the State's argument that the relevant comparison is State taxes, rather than State and local taxes. As the State puts it, "the only 'act' Congress precluded Defendants from doing in section (b)(4) was to 'impose another tax that discriminates,'" State's Br. at 5, and "*allowing* a local government to levy a tax is not the same as *imposing* the tax," State's Br. at 5 (emphasis in original). Because no local governmental entities are defendants in this particular lawsuit, and the State has merely allowed such entities, in their discretion, to levy additional taxes, the court concludes that State tax statistics provide the relevant comparison for purposes of this case. *See* State's Reply Br. at 16 ("[T]he State Defendants do not 'impose' the local sales taxes; local officials do. These local officials are independent actors who must be (and have been) sued as independent

---

Also, the referenced language states that "[t]he United States Supreme Court has upheld taxing *statutes that appeared to discriminate against interstate commerce* by holding that the state's tax scheme compensated for the tax by a substantially equivalent tax on *intrastate* commerce." *White v. Reynolds Metal Co.*, 558 So. 2d 373, 387 (Ala. 1989) (citing *Gregg Dyeing*, 286 U.S. 472) (emphasis added). Again, the tax scheme at issue here does not distinguish based on a taxpayer's in-state or out-of-state character.

defendants under the 4-R Act.").[14]  Narrowing the inquiry accordingly, during a recent nine-year period, motor carriers paid 19¢ per gallon for undyed diesel to the State, while rail carriers only paid 9.85¢ per gallon for dyed diesel.  State's Exs. 1–2.  With rail carriers paying, on average, less than half the amount of tax motor carriers pay, the evidence does not support a finding that the State's failure to exempt rail carriers from the sales tax for dyed diesel results in discrimination against the rail carriers.

Alternatively, even if the court again considered both State and local taxes, the taxes are still roughly equivalent.  During this same period, motor carriers and rail carriers each had a higher tax burden than the other an equal number of times.  State's Ex. 2.  As to the actual amount, motor carriers paid 20–23¢[15] per gallon and

---

[14] *But see* CSX's Br. at 31 n.24 ("The authority for cities and counties to impose a local sales tax emanates solely from the state statutes.") (citation omitted); *id.* ("[A]n injunction in this case will bind Alabama localities as 'parties acting in concert or participating with' the named defendants. Fed. R. Civ. P. 65(d)(2).").

[15] CSX cites the 2012 testimony of Steve DuBose (which it did not offer in the 2016 trial), doc. 65 at 64, for the proposition that the State's

> Exhibit 2 is . . . flawed because it inflates the "average state and local motor fuel" rate by assuming an average rate of 23¢ per gallon (i.e., 19¢ state rate plus 4¢ local rates).  CSX's analysis, presented by Vickie Friedman, is far more thorough, taking into account variations in local motor fuel taxes, including the fact that Birmingham (where CSX purchases almost all its fuel) imposes no motor fuel tax at all.  Although the motor fuel rate may be 4¢ in Mobile, the majority of local motor fuel taxes (if any) are 1 or 2 cents a gallon.

CSX's Br. 23 n.25.  To clarify, DuBose testified that local fuel taxes "range from 1 cent to 6 cents," and that most taxes are "1 or 2 cents a gallon."  Doc. 65 at 64.  Critically, however, as the State points out, Friedman testified on cross-examination that "there's no way that trucks buy 88 percent of their diesel fuel in [Birmingham]," Trans. 498–500, and that trucks actually purchase

rail carriers paid 23.48¢ for each gallon of fuel purchased in the state.  State's Exs. 1–2.  With these averages differing by some quantity between less-than-half-of-one cent and 3.5 cents, the court concludes that the fuel-excise tax motor carriers pay is "roughly equivalent" to the sales tax CSX pays.  Accordingly, under the framework the Supreme Court articulated, *see CSX II*, 135 S. Ct. at 1144 (remanding for consideration of "whether Alabama's fuel-excise tax is the rough equivalent of Alabama's sales tax as applied to diesel fuel, and therefore justifies the motor carriers sales-tax exemption"), the State has shown sufficient justification for the disparate sales tax treatment of rail carriers vis-à-vis motor carriers.[16]

---

their fuel "interspersed all over the State[,] just when they need to fill up," Trans. 501–02. Finally, when accounting for this fact, Friedman testified that the tax rates rail and truck carriers paid were "very similar."  Trans. 504.

[16] To support its contention of discrimination, CSX presented evidence at trial regarding how the State spends its sales tax revenue (*i.e.*, public education) as opposed to how it spends the fuel-excise tax revenue (*i.e.*, on highway maintenance).  *See, e.g.*, Trans. 28, 107–08, 346; CSX's Ex. 5 ¶¶ 2, 30.  Basically, CSX maintains that motor carriers receive a benefit from the taxes they pay and that rail carriers do not.  However, CSX's admissions that it benefits from the highway projects and from the funding of Alabama public education belie this contention.  *See, e.g.*, State's Exs. 15; 16 at 3–5 (CSX employs more than 1,200 Alabamians and actively recruits students from public universities such as Auburn and Alabama); 19 at 7–10, 14 (CSX benefits from State projects at railroad crossings that ultimately reduce CSX's legal and financial liability for accidents).  Moreover, the 4-R Act provides no limitation or instruction for a state's spending of its tax revenues, and the court refuses to read into subsection (b)(4) any directive regarding a state's spending of revenue from "another tax" that it collects from rail carriers, assuming the tax is collected through non-discriminatory means.  *See BNSF Ry. Co. v. Tenn. Dep't of Revenue*, 800 F.3d 262, 274 (6th Cir. 2015) ("[H]ow Tennessee uses the proceeds of its taxation of diesel fuel is irrelevant to the question of whether the Railroads have been discriminated against within the meaning of the 4-R Act.").

## C. The State Provides Sufficient Justification for Exempting Water Carriers from the Sales Tax

The State also contends that its exemption of water carriers is justified, because:  subjecting water carriers to the sales tax would expose the State to liability under various federal laws; water carriers impose virtually no financial burden on the State; and CSX has suffered no competitive injury.  The court agrees in part, as explained below.

### 1. Federal Law

The State contends that the Commerce Clause and federal laws prohibit it from taxing water carriers for the fuel they purchase in Alabama.

#### a. The Commerce Clause

In *Complete Auto Transit, Inc. v. Brady*, the Supreme Court stated that its decisions have "sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the State."  430 U.S. 274, 279 (1977).  The Court elaborated on the *Complete Auto* test in *Commonwealth Edison Co. v. Montana*, stating:  "Under this threshold test, the interstate business must have a substantial nexus with the State before any tax may be levied on it."  453 U.S. 609, 623 (1981) (citing *Nat'l Bellas Hess, Inc. v. Ill. Revenue Dep't*, 386 U.S. 753 (1967)).  *See*

*also Barclays Bank Plc v. Franchise Tax Bd.*, 512 U.S. 298, 311 (1994) (*Complete Auto* "sufficient nexus" requirement met when taxpayers did business in the state).

Based on this test — in particular the relation to services provided by the state, the State asserts that if it repealed the interstate water carrier exemption, these carriers could claim a violation of *Complete Auto* "because (a) interstate water carriers travel on federal waters and may never contact state land and (b) the federal government, not the State, spends monies licensing, policing, and maintaining commercial water traffic."[17]   State's Br. at 22.   Indeed, at trial, the State presented evidence that it provides virtually no services to interstate water carriers.  *See, e.g.*, State's Ex. 44 at 73–75; Trans. 96, 131–34, 363, 371 (federal government funds all river dredging and lock and dam maintenance); Trans. 63, 97, 130, 149, 348 (State spends no tax dollars on river maintenance projects); Trans. 124, 149 (State does not fund commercial water traffic regulation or

---

[17] The State also argues that taxing water carriers would run afoul of the prong that requires a substantial nexus with the State.  According to the State, in 2013, 44.2% of Alabama's waterborne shipments were foreign goods either originating or terminating in Alabama, meaning that "nearly half of all shipments carried by Alabama water carriers are subject to international law and thus raise . . . commerce clause issues that never arise in CSX's rail business."  State's Br. at 27.  The State therefore contends that imposition of the sales tax could result in "multiple international taxation" or undermine the nation's ability to "speak with one voice" when regulating commerce with foreign governments.  *Id.* at 28 (citing *Japan Line, Ltd. v. County of Los Angeles*, which stated that "[w]hen a State seeks to tax the instrumentalities of foreign commerce, two additional considerations, beyond those articulated in Complete Auto, come into play," 441 U.S. 434, 446 (1979), and that "a state tax on the instrumentality of foreign commerce may impair federal uniformity in an area where federal uniformity is essential," *id.* at 448).  The court does not have to reach this secondary issue because CSX says that it "does not assert any claims . . . based on the exemption of foreign water carriers, and they are not in the stipulated comparison class as approved by the Supreme Court in *CSX II*."  CSX's Br. at 41.

enforcement); State's Exs. 23, 44 at 75; Trans. 122, 363, 371–72 (ALEA's jurisdiction limited to recreational water traffic).[18]   In light of the evidence presented at trial, the court finds that the State has established that, under *Complete Auto*, imposition of a state sales tax on interstate water carriers would expose the State to liability under the negative Commerce Clause.   As such, the State has established that the exemption for water carriers "is compelled by federal law." *CSX II*, 135 S. Ct. at 1144.

### b. The Maritime Transportation Security Act of 2002

The State asserts also that subjecting water carriers to the sales tax could violate the Maritime Transportation Security Act of 2002 ("MTSA").   State's Br. at 23.   The MTSA amended section 5 of Title 33 of the United States Code, originally enacted in 1884, which prohibits the levying of tolls or operating charges upon any water craft "passing through any lock, canal, or canalized river" owned by the United States.   33 U.S.C. § 5(a).   The MTSA amendment, codified as a new subsection (b), provides, in pertinent part:

> No taxes, tolls, operating charges, fees, or any other impositions
> whatever shall be levied upon or collected from any vessel or other
> water craft, or from its passengers or crew, by any non-Federal
> interest, if the vessel or water craft is operating on any navigable

---

[18] The State cites also *American River Transp. Co. v. Bower*, 351 Ill. App. 3d 208, 212 (2004), which affirmed summary judgment in favor of a tugboat company on a negative Commerce Clause claim when there was "no fair relation between the use tax and the benefits that [the tugboat company] received from the state for the use by its line haul tugboats of the navigable waterways of the United States."   State's Reply Br. at 28.

waters subject to the authority of the United States, or under the right
to freedom of navigation of those waters . . . .

33 U.S.C. § 5(b).

The State contends that interstate water carriers "could argue that the plain
language of § 5(b) preempts Alabama's sales tax as applied to their purchase or use
of fuel because Alabama's sales tax on diesel fuel is a 'tax . . . collected from any
vessel or other water craft . . . by [a] non-Federal interest,'" and no exception
applies.[19]   State's Br. at 23.  To support its contention, the State cites *Moscheo v.
Polk County*, No. E2008-01969-COA-R3-CV, 2009 WL 2868754 (Tenn. Ct. App.
Sept. 2, 2009), and *Kittitanny Canoes, Inc. v. Westfall Township*, No. 183 CV
2013, 2013 WL 8563483 (Pa. County Ct. May 6, 2013), both of which relied on
the MTSA to strike down taxes for recreational activities on waterways.

These cases are not helpful, because, as CSX points out, they address taxes
on *passengers* of vessels on navigable waters.  *See* CSX's Br. at 36 (noting that the
text of § 5(b) is limited to taxes "from any vessel or other water craft, or from its
passengers or crew").  In contrast, and relevant here, other courts have found that
the MTSA's "prohibition does not apply to taxes imposed on things other than the
vessel, its passengers, or crew, such as taxes on the fuel used, or the privilege of
doing business or using goods or services in the state."  *Id.* (citing *Commercial
Barge Line Co. v. Director of Revenue*, 431 S.W.3d 479, 484 (Mo. 2014) (no

---

[19] The exceptions are provided in 33 U.S.C. § 5(b)(1)–(3) but are not at issue here.

violation of MTSA where state was "assessing sales and use tax on the goods and supplies delivered to the Taxpayers' towboats while they [were] in Missouri" and not "taxing the barges, towboats, or their crews"), and *Reel Hooker Sportfishing, Inc. v. Department of Taxation*, 236 P.3d 1230, 1232 (Haw. Ct. App. 2010) ("33 U.S.C. § 5(b) does not preempt the assessment of [the Hawaii general excise tax] on the charter fishing revenue of these Hawaii businesses because [the general excise tax] is a tax assessed on gross business receipts for the privilege of doing business in Hawaii, and is not a tax on their vessels or passengers")).  The court agrees with this plain reading of the MTSA, and finds that it does not preempt the imposition of a sales tax on the diesel fuel used by water carriers.

###### c. The 1819 Congressional Act admitting Alabama to the Union

The State cites next the congressional act admitting Alabama to the Union. Under that act, "all navigable waters within [Alabama] shall for ever remain public highways, free to the citizens of said state and of the United States, without any tax, duty, impost, or toll, therefor, imposed by the said state," Res. of Mar. 2, 1819, 15th Cong. (1819), 3 Stat. 489, 492.  According to the State, this act prohibits it from assessing a sales tax on diesel fuel purchased by water carriers.

CSX directs the court to *Battle v. Corporation of Mobile*, in which the Alabama Supreme Court addressed whether the city of Mobile's "power to lay taxes on both real and personal estate within the city, making no distinction as to

any persons," violated the congressional act "declar[ing] that [the State's] rivers shall forever remain public highways, without the imposition of any duty, tax, or impost by the State."  9 Ala. 234, 236 (1846).   The Court held that "th[e] tax, not being a specific one, applicable alone to steamboats, but a general one, extending to all personal estate," was "free from constitutional objection."   *Id.* at 238. Because the Alabama Supreme Court, tracking the language of the congressional act, held that a generally applicable tax did not violate the act, and because the State presents no authority supporting a contrary conclusion, this court agrees with CSX that this act does not appear to prohibit the State from subjecting water carriers to the generally applicable sales tax on diesel fuel.

      2.  <u>The State's argument that trains and water carriers are not "similarly situated"</u>

The State also contends that it can justify the exemption of water carriers from the sales tax in light of the extensive evidence that "[t]rains burden the State fisc more than foreign/interstate water carriers do."  State's Br. at 17.  The State's sole articulated basis for presenting evidence of relative burdens is as follows:

> In *Oregon Waste Systems, Inc. v. Oregon Dep't of Environmental Quality* — one of CSX's seminal cases in the "compensatory tax" defense — the Supreme Court noted another, distinct justification for imposing a greater tax on the plaintiff than the comparison class:  the plaintiff "imposes higher costs" on the State

than the comparison class does.  511 U.S. 93, 101.[20]  That justification
applies here.

State's Br. at 17 (footnote in original).  As discussed at length in Part IV.B.1,
*supra*, reliance upon negative Commerce Clauses like *Oregon Waste* is misplaced,
because the court is not presented with alleged discrimination based on an entity's
in-state or out-of-state character.  Perhaps more importantly, the State presented no
evidence to establish that it took into account the varying burdens imposed by rail
carriers and water carriers when setting rail carriers' sales tax rate at 4% like most
other taxpayers.  As CSX puts it, the relative burdens are irrelevant, because
"Alabama sales tax is not calibrated to account for varying burdens."  CSX's Br. at
39 (citing doc. 137 at 2).  The court agrees.

### 3.  The State's Argument that CSX Has Suffered No Competitive Injury

Finally, the State asks this court to find that Alabama's sales tax exemption
for interstate water carriers does not negatively impact CSX's competition with
interstate water carriers.  The State correctly notes that CSX's director of
agriculture and food marketing (the only area in which the record shows
competition between CSX and water carriers) could not testify that the competing
water carriers purchase dyed fuel in Alabama and, therefore, avail themselves of

---

[20] The Court fleshed out the "higher costs" justification thusly:  "[I]f out-of-state waste
did impose higher costs on Oregon than in-state waste, Oregon could recover the increased cost
through a differential charge on out-of-state waste, for then there would be reason, apart from its
origin, why solid waste coming from outside the [State] should be treated differently."  511 U.S.
at 101 n.5 (internal quotes omitted).

the sales tax exemption at issue.  State's Br. at 34.  Thus, according to the State, "correcting" the disparate tax treatment would not change anything, and CSX has failed to prove any competitive injury.  As the State points out, the Supreme Court has held, albeit in a negative Commerce Clause case,[21] that when "different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed," elimination of the "tax or regulatory differential would not serve the . . . fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State . . . ."  *GMC v. Tracy*, 519 U.S. 278, 297–99 (1997).  Because CSX presented no evidence that enjoining the State from taxing its purchase of dyed diesel would affect the level of competition between CSX and water carriers, the court finds that there is no discriminatory effect.

## V.    CONCLUSION

Because the court finds that:  (1) the State does not force rail carriers to use dyed diesel (and thus, any "discrimination" results from CSX's business practices rather than State law) or alternatively, the sales tax and fuel-excise tax are roughly equivalent; (2) a failure to exempt water carriers from the sales tax could violate the Commerce Clause; and (3) CSX has suffered no competitive injury from the

---

[21] Although the court found in Part IV.B.1, *supra*, that negative Commerce Clause cases did not shed light on whether the fuel-excise tax and sales tax are "roughly equivalent," where, as here, the State does not treat motor carriers and rail carriers differently based on in-state or out-of-state status, this logic does not apply to a discussion of whether enjoining the sales tax would increase CSX's profits.

State's exemption of water carriers from the sales tax, the court concludes that Alabama's tax scheme does not violate the 4–R Act.  The court will enter an order contemporaneously herewith dismissing CSX's claims with prejudice.

      **DONE** the 29th day of March, 2017.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE